**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 13** |
| | ) | |
| **DENNIS & MYRNA JOHNSTON,** | ) | **Case No. 12-51263** |
| | ) | |
| Debtors. | ) | |
| _____) | | _____ |
| **DENNIS & MYRNA JOHNSTON,** | ) | |
| | ) | |
| Plaintiffs, | ) | **A.P. No. 12-05066** |
| | ) | |
| v. | ) | |
| | ) | |
| **SUNTRUST BANK,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION
DENYING DEBTORS' MOTION TO STRIP
LIEN FROM REAL PROPERTY**

At Harrisonburg in said District this 12th day of April, 2013:

On September 26, 2012, Dennis and Myrna Johnston filed this Chapter 13 petition and in November initiated the above captioned adversary complaint. The complaint is an action to determine the validity and extent of SunTrust Bank's lien on the debtors' residence and to strip said lien from the property. SunTrust timely filed its answer to the complaint on November 30, 2012, disputing the debtors' valuation of their residence. The Court held a trial on February 26, 2013. The debtors admitted into evidence an appraisal of the residence performed by Joseph Vita, and several pictures of their home. SunTrust admitted into evidence an appraisal of the debtors' residence performed by Gregory Mays. At the trial, the appraiser, Mr. Vita, testified for

the debtors, as did the debtors themselves; the appraiser, Mr. Mays, testified for SunTrust.  The appraisers were deemed to be experts by oral stipulation of the parties at trial.  After reviewing the pleadings and exhibits and considering the testimony given at trial, the Court makes the following findings of fact and conclusions of law.

## Facts

SunTrust filed a proof of claim in the amount of $72,527 as secured by the debtors' residence.  SunTrust's lien is junior to JPMorgan Chase's lien against the debtors' residence.  *See* Pl.'s Cmpl. ¶ 5 *Johnston v. SunTrust Bank, (In re Johnston)* No. 12-05066 (Bankr. W.D. Va. Feb. 26, 2013), ECF No. 1.  At the time of petition, the payoff amount for the JPMorgan lien was $165,760.[1]  *See id.*; *see also* Pl.'s Cmpl. at Ex. D *Johnston* No. 12-05066, ECF No. 1.  The only fact at issue is the value of the debtors' residence.  The male debtor testified that in his opinion the value of his residence was $150,000. Transcript of Hearing at 8-17:24, *Johnston v. SunTrust Bank, (In re Johnston)* No. 12-05066 (Bankr. W.D. Va. Feb. 26, 2013), ECF No. 18 (hereinafter "Hr'g Tr."). In addition, he testified as to several repairs and estimated costs for the repairs. Hr'g Tr. at 13:24-51:25. The two appraisers prepared reports and each provided testimony as to his opinion of value of the residence. Both appraisers agree on the following:

1) the sales comparison method of valuation is most appropriate for valuing the debtors' residence;

2) the particular location of the debtors' real estate makes finding well-suited comparable sales difficult.

Mr. Vita's appraisal used three comparable sales with adjustments and concluded that the debtors' house was worth $156,300.  Mr. Mays' appraisal used six comparable sales with

---

[1] Although SunTrust did not admit this factual allegation in its answer, at no point did SunTrust dispute this factual allegation.

adjustments and concluded that the debtors' house was worth $195,000. Each appraiser, as expert witness, was able to support his appraisal in a convincing way. Neither appraiser attacked the methodology of the other appraiser, nor did the appraisals share any comparable sales in common. Each appraiser, however, explained why he had not included certain comparable sales in his analysis.

Mr. Vita's appraisal evaluated three properties. Two of Mr. Vita's comparables were "REO"[2] properties. Mr. Vita noted that an appraiser must be careful when including an REO sale in an appraisal because REO sales are often thought of as bargain properties that sell below market price. Hr'g Tr. at 76:24-77:29. Mr. Mays explained that the bargain often stems from a bank's ability to absorb a loss that a typical homeowner cannot absorb. *Id.* at 135:7-14. Mr. Vita suggested that REO properties can be used in appraisals when REO sales make up a significant portion of the market. *Id.* at 76:24-77:3. Mr. Vita supported the use of REO properties in his appraisal of the Johnston's home by stating that 32% of the real estate sales activity in 2012 in Rockbridge County had been REO sales. Hr'g Tr. 77:18. Mr. Vita also hypothesized that the bargain status of REO properties evaporates once the property has been on the market a long time because the bank will have dropped the price to the minimum the bank is willing to accept.[3] *Id.* at 77:13-79:2. Mr. Vita cited that the two REO properties in his group of comparable sales had been on the market for over six months, and that one of the REO properties had been on the market for over a year. *Id.* at 79:4-9.

---

[2]     "REO" stands for "Real Estate Owned" and commonly refers to real estate owned by a lender, either after an unsuccessful foreclosure auction or through a deed in lieu.

[3]     This reasoning implies that a property that does not sell for many months is either at or above market prices because those properties priced below market prices presumably would be sold to a willing buyer in an efficient market.

3

During Mr. Mays' testimony, he stated that REO sales "tend to be grossly under normal market prices." *Id*. at 124:12. Mr. Mays only uses REOs in appraisals under one of two circumstances: (1) when a particular REO sale has independent indications that it was an "arm's length" transaction; or (2) when necessary to demonstrate the depressive effect REOs have on the market. *Id*. at 124:3-8. Mr. Mays criticized Mr. Vita's theory that one can include comparable REO sales in an appraisal when they make up a significant portion of the market because, he explained, what is important is the percentage of REO sales in a given market segment, not the market as a whole. *Id*. at 132:17-25. Mr. Mays stated that most REOs were priced under $100,000 and that the Johnston property was clearly not in the same price bracket as houses selling for under $100,000, thereby implying that it was inappropriate to use sales of REO properties in an appraisal of the Johnston home, as it was in a different segment of the market from the bulk of the REO sales. *See id*.

During cross examination of Mr. Mays, debtors' counsel asked several questions about the first comparable in Mr. Mays' report: the property located on South Lee Highway. *Id*. at 139:15-142:17. The questioning implied that Mr. Mays' use of the South Lee Highway property was either inappropriate or was not properly adjusted. *See id*. To a lesser extent, debtors' counsel also questioned Mr. Mays about his use of his second comparable located on Gingerbread Lane. *Id*. at 143:23-144:21. Again, the questions implied that Mr. Mays' use of the Gingerbread Lane property was either inappropriate or was not properly adjusted. *See id*.

Arguments of the Parties

Debtors' counsel made several arguments as to why the debtors' residence should be found to be worth less than $165,760. First, counsel argued that the male debtor's valuation of $150,000 should be given credence because he is a long-time resident with knowledge of the

4

property and familiarity with the area. *Id*. at 163:10-13. This argument implies that the valuations presented by the two appraisers were less reliable than the male debtor's valuation. Although both appraisers did admit that finding comparable sales was difficult and involved subjective choices that influenced valuation, the Court has no evidence before it to support a conclusion that the appraisal methods used were unreliable. Further, the male debtor did not provide any testimony as to how he arrived at his valuation of $150,000. *See id*. at 9:17-24. The appraisers were able to detail their methodology and explain the subjective choices involved in arriving at their conclusions. *See id*. at 65:8-13, 69:4-69:8, 70:23-73:1, 118:1-10, 120:1-13, 121:6-17; s*ee also* Pls.' Ex. 1 and Def. Ex. A, *Johnston v. SunTrust (In re Johnston),* No. 12-05066 (Bankr. W.D. Va. Feb. 26, 2013), ECF No. 14. When examining a question of valuation, the Court finds an estimate of value that includes a methodology to be more persuasive because a methodology allows the Court to critically evaluate the reasoning behind a valuation. In addition, both appraisers are experts and have been valuing property in Rockbridge County for decades. Hr'g Tr. at 59:11-60:4, 119:19-23. Therefore, the Court concludes that the male debtor's valuation is not an adequately reliable estimate of value when compared with the valuations provided by the appraisers.

Debtors' counsel urged the Court not to give any weight to comparables one, two and three in Mr. Mays' report because the unadjusted sale price for those comparables was higher than the others and seemed to be in a range that was significantly higher than the final estimates of value submitted by either appraiser. *Id*. at 164:9-14. Debtors' counsel bolstered his argument regarding the first three comparables by highlighting several elements of those properties, including manicured lawns, and in one, the presence of a creek and vaulted ceilings, that Mr. Mays had not adjusted for in his appraisal. *Id*. at 166:19-23. Counsel reasoned that such

amenities had a value and Mr. Mays' adjustment of $5,000 was grossly insufficient to account for the difference between the overall condition of Debtors' property and the comparable properties with such amenities. *See id*.

Debtors' counsel stressed that debtors' home had ten or more years of deferred maintenance and that the male debtor's testimony on the topic was more reliable because of his experience in performing the needed maintenance tasks and the research he had done as to the costs. *Id*. at 162:18-20, 163:12-23. Finally, debtors' counsel made sure to remind the Court that neither appraiser had accounted for the water in the crawl space that had been shown in exhibits attested to by the male debtor.[4] *See* Pls.' Ex. 5, 8, and 14, *Johnston*, No. 12-05066, ECF No. 14. While the male debtor testified as to estimate costs of the repairs, the debtors did not provide a sum totaling the costs of repairs attested to by the male debtor. *See* Hr'g Tr. at 163:24-164:1. Creditor's counsel, in her closing argument, stated that the sum needed to make the repairs according to the figures provided by the male debtor in his testimony was $17,426. *Id*. at 171:11-13.

## Conclusions of Law and Discussion

This matter is a core proceeding to determine the validity, extent, or priority of a lien against property of the estate in which a final judgment may be entered by this Court. 28 U.S.C. § 157(b)(2)(K). Venue is proper in this district under 28 U.S.C. § 1409(a). The defendant has been properly served and has appeared. The matter is ripe for decision by this Court.

In order to be successful in a lien avoidance action, the plaintiff must establish that the lien is wholly unsecured.[5] *See In re Millard*, 414 B.R. 73, 78 (D. Md. 2009) (debtor may avoid

---

[4] The male debtor's testimony did include an estimate for rectifying the issue of water in the crawl space.

[5] The mechanics of a lien strip in Chapter 13 combine the power of three separate code sections. First a debtor must utilize the interaction of section 506(a) and section 1322(b)(2). *SunTrust Bank v. Millard (In re*

consensual lien if wholly unsecured); *Peterson v. United BankShares, Inc. (In re Peterson)*, 2011 Bankr. LEXIS 113, *3 (Bankr. E.D. Va. Jan. 13, 2011) (debtor may not avoid a consensual lien that is partially secured); *see also Lane v. Western Interstate Bank Corp.,* 280 F.3d 663 (6th Cir. 2002) (Chapter 13 debtor may strip off wholly unsecured second mortgage). Therefore, the ultimate question before the Court is whether the debtors' residence, at the time of the petition, was worth more than $165,760 (the value of the first lien at the time of petition).

In answering this question, the Court must first determine who bears the burden of proving the value of the house. The circumstances surrounding a question of value will determine the assignment of the burden of proof. *See Young v. Camelot Homes, Inc. (In re Young)*, 390 B.R. 480, 486 (Bankr. D. Me. 2008) (*citing* 4 Collier on Bankruptcy ¶ 506.03[9]). Sometimes the burden of proof is provided by statute. *See* 11 U.S.C. § 362(g) (burden of proof on party moving for relief from the automatic stay on issue of debtor's equity in the property, but the burden of proof on all other issues is on the party opposing relief); 11 U.S.C. § 363(p) (burden on the trustee moving for use, sale or lease of estate property on issues of adequate protection, but burden on the entity asserting an interest in property to show the validity, priority, and extent of such interest). When the burden of proof is not explicitly stated in a statute, case law may answer who bears the burden.

For example, case law addresses the burden of proof for plan confirmation contests and claims objections. In a plan confirmation context, the initial burden falls on the objecting party to articulate a *prima facie* objection; however, the ultimate burden is on the debtor to prove that the plan complies with confirmation requirements. *In re Martellini*, 482 B.R. 537, 541 (Bankr. D.

---

*Millard)*, 414 B.R. 73, 77 (D. Md. 2009). Section 506(a) can be used to establish that a lien is wholly unsecured; then, section 1322(b)(2) provides an avenue through which a debtor can modify a lien. *Id*. The debtor's chosen modification is to strip the lien using section 506(d) because section 506(d) states that a lien securing a claim is void if it is "not an allowed secured claim." 11 U.S.C. § 506(d).

7

S.C. 2012) (finding that after a trustee produces evidence of a *prima facie* case that the debtor is not devoting his projected disposable income to the plan, the burden shifts to the debtor to demonstrate compliance with section 1325(b)).  In the claims allowance context, when a debtor objects to the allowance of a claim under section 502, the initial burden often falls on the debtor, but the ultimate burden of persuasion lies with the creditor.  *See Stancill v. Harford Sands Inc. (In re Harford Sands Inc.)*, 372 F.3d 637, 640-641 (4th Cir. 2004) (explaining that: (1) the filing of a proof of claim constitutes *prima facie* evidence of the validity of that claim; (2) the debtor must overcome this presumption by putting on evidence contesting the validity; (3) if the debtor overcomes the presumption of validity, then the ultimate burden lies with the creditor to prove the validity of its claim by a preponderance of the evidence).  Which party has the ultimate burden of proof in the context of a motion under section 506(a) to determine the value of collateral underlying a secured proof of claim is not defined by statute.  Nor is existing case law clear on who bears the burden.  *See In re Heritage Highgate, Inc.*, 679 F.3d 132, 139-140 (3d Cir. 2012) (noting a three-way split of authority on the issue, with some placing the burden on the debtor, some placing the burden on the creditor, and some shifting the burden by placing the initial burden on the debtor and the ultimate burden on the creditor).  The Court, therefore, is left without specific statutory authority or case law precedent to determine who bears the burden of proof in the context of an action to strip a mortgage lien in a Chapter 13 case.

Furthermore, the lien strip action is analogous to both a contested confirmation and claims allowance action.  Therefore, by analogy, the Court could support assigning the burden of proof upon either the debtor or the creditor.  In the first analogy, the Court can justify assigning a Chapter 13 debtor with the burden of proof because the valuation and lien strip is critical to how the creditor is treated under a Chapter 13 plan, and in matters of plan confirmation, the burden

falls upon a debtor to prove that the debtor's plan is confirmable. *See IRS v. Stewart (In re Stewart)*, 172 B.R. 14, 15-16 (W.D. Va. 1994) (citations omitted) (noting that the burden is on a debtor to prove a proposed plan complies with requirements of the Bankruptcy Code). Alternatively, the Court can justify assigning the burden of proof upon the creditor by analogizing a section 506 proceeding to value and strip a second mortgage to an objection to claim under section 502. Such an analogy works because in a section 506 proceeding, a debtor is in effect objecting to the allowance of the secured creditor's proof of claim as filed. *See Heritage Highgate,* 679 F.3d at 139-140 (describing the burden of proof in a section 506(a) proceeding by applying rules for burden of proof in context of an objection to the allowance of a secured proof of claim). This Court instead will adopt the method Judge Stone applied in *In re Brown*.[6] In that case, Judge Stone compared the relationship between the parties' economic motivations and the assignment of the burdens of proof from other parts of the Bankruptcy Code involving valuation to reason which party should carry the burden of proof in a contested valuation proceeding linked to plan confirmation. *See In re Brown*, 244 B.R. 603, 609 (Bankr. W.D. Va. 2000) (citing the underlying economic motivations as a main factor for determining that a debtor holds the ultimate burden of proof in the context of collateral valuation for a Chapter 13 plan confirmation, when the debtor proposes to retain the collateral).

The debtors' economic motivation in this lien strip action is akin to a creditor's motivation in a relief from stay action: to obtain the lowest possible valuation of the property. By considering the underlying economic motivations of the parties, the Court concludes that in an action to strip a lien from a debtor's primary residence, a Chapter 13 debtor bears the burden to prove he is entitled to prevail. Moreover, assigning the burden of proof to the debtor is consistent with an aphorism of the legal system: the party seeking relief or seeking to change the

---

[6]  244 B.R. 603 (Bankr. W.D. Va. 2000).

status quo bears the burden of proving that he is entitled to relief. *See Schaffer v. Weast*, 546 U.S. 49, 51, 56-57 (2005) (stating that the burden of proof typically lies upon the party seeking relief). This conclusion is bolstered when the Court examines the analogies considered above: each place the burden on the party seeking relief. In the plan confirmation analogy, the ultimate burden is on the debtor who is seeking relief in the form of plan confirmation. In the objection to claim analogy, the ultimate burden is on the creditor who is seeking the relief in form of payment on a debt. Indeed, if the burden to prove valuation in a Chapter 13 lien strip action was placed on the objecting party, rather than the moving party, the result ultimately would be to relieve the debtor of his requirement to carry the burden of proof on the elements of section 1325(a).[7] See *Brown,* 244 B.R. at 609-10, (citing *Tillman v. Lombard*, 156 B.R. 156 (E.D. Va. 1993)) (finding that the value of an allowed secured claim is first set forth in a debtor's proposed Chapter 13 plan and accordingly a necessary element upon which a debtor carries the burden of proof, and is not relieved by an objection to confirmation).

This Court concludes the burden of proof falls on the debtor to show by a preponderance of the evidence[8] that he is entitled to the relief requested under section 506. A preponderance of the evidence standard requires the party with the burden "to present evidence that makes the fact in issue to appear more likely or probable in the sense that actual belief in its truth, derived from

---

[7] If the Court was to hold otherwise, a debtor could couple his Chapter 13 plan with a separate action to value collateral or determine the extent, validity and priority of a lien in order to avoid his requirement to carry the burden to prove that a plan meets the requirements of section 1325(a)(5).

[8] The Court will use a preponderance standard because it is the default standard and, therefore, appropriate for a situation in which the statute does not explicitly state the standard. *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1881 (U.S. 2011)(noting that the preponderance of evidence standard is the default rule for civil cases). In addition, similar cases have used a preponderance standard. *Financial Sec. Assur. v. T-H New Orleans Ltd. Pshp. (In re T-H New Orleans Ltd. Pshp.)*, 116 F.3d 790, 798 (5th Cir. 1997) (requiring a Chapter 11 creditor to show by a preponderance that it is over-secured and entitled to interest payments under section 506(b)); *Young*, 390 B.R. at 486 (using a preponderance standard in a section 506(a) valuation); *Brown*, 244 B.R. at 607 (using a preponderance standard for a valuation within a plan confirmation context); *In re Robertson*, 135 B.R. 350, 352 (Bankr. E.D. Ark. 1992) (using a preponderance standard in a section 506(a) valuation).

the evidence, exists in the mind . . . of the tribunal notwithstanding any doubts that may still linger there." *In re Brown*, 244 B.R. at 612 (internal quotations and citations omitted).

In order to determine if the debtors have met this burden, the Court examined the evidence in light of the arguments made by the parties. First, the Court examined what the average adjusted price estimate would be if the Court ignored Mr. Mays' first three comparables. The average adjusted price of Mr. Mays' last three comparables equals $178,195.[9] Thus, if the Court considers the evidence presented by SunTrust in a manner urged by debtors' counsel, it would show a value greater than the amount of the first lien deed of trust. Next, the Court considered Mr. Mays' last three comparables plus Mr. Vita's three comparables and calculated an average of the six comparables, generating a valuation figure of $167,258.[10] This method also yields a valuation of the debtors' residence at more than the outstanding principal on the first lien. Thereafter, the Court computed the average of Mr. Mays' last three comparables, but adjusted these comparables by the repair numbers supplied by the male debtor, rather than Mr. Mays' $5,000 adjustment for condition of the property. The average of Mr. Mays' last three comparables when readjusted is $165,769.[11] Still, this is $9 above the magical break point of $165,760.

---

[9] Mr. Mays' last three comparables are 12 Wachovian Way ($199,560); 131 Bunker Hill Mill Rd ($174,907); and 10 Stoneview Circle ($160,119). The average of these three adjusted prices is their sum divided by three - $534,586/3 = $178,195.33.

[10] Mr. Vita's comparables are 41 Traveler Circle ($179,700); 21 Wingwalker Way ($146,500); and 90 Blackberry Lane ($142,755). The sum of all six comparables = $534,586 (see arithmetic in previous footnote) + $468,955 = $1,003,541. The average of these six comparables is their sum divided by six - $1,003,541/6 = $167,256.83.

[11] Mr. Mays' last three comparables are 12 Wachovian Way ($199,560); 131 Bunker Hill Mill Rd ($174,907); and 10 Stoneview Circle ($160,119). If we adjust each comparable by using the male debtor's repair figure of $17,426 instead of Mr. Mays' $5,000 for condition of the property, we adjust each value by $12,426 - 12 Wachovian Way ($187,134); 131 Bunker Hill Mill Rd ($162,481); and 10 Stoneview Circle ($147,693). The average of these new adjusted values is $497,308/3 = $165,769.33.

Only when Mr. Vita's three comparables are averaged with Mr. Mays' last three comparables, readjusted by the male debtor's repair figures, does one arrive at an estimated value that is below the breakpoint.[12] To adopt this conclusion requires the Court to ignore the three comparables that Mr. Mays believed, in his expert opinion, to be the most reliable because he adjusted them the least. In addition, it ignores the creditor's objection to Mr. Vita's use of two "REO" properties in his estimate of value or account for any limitation in using REO properties in market valuations. Finally, it requires the Court to amend expert valuations by an adjustment not applied by either expert. The Court finds the evidence as a whole makes the fact in issue (whether the value of the house is greater than $165,760) more likely true. *See Brown,* 244 B.R. at 621 (describing the preponderance of evidence requirement to present evidence that makes the fact in issue *more likely true*, notwithstanding any doubts that may still linger) (emphasis added).

Given the totality of the evidence, the Court finds that the preponderance of the evidence does not show that the value of the Johnston residence is less than $165,760. The debtors have failed to carry their burden of persuading the Court that their residence was worth less than the first lien on the property ($165,760) as of the petition date. The SunTrust debt, therefore, is not wholly unsecured.

## Conclusion

The Court finds that the value of the debtors' residence is not less than $165,760. The Court concludes that SunTrust has a claim that is not wholly unsecured. The Court therefore

---

[12] $497,308 (see arithmetic in previous footnote) + $468,955 (see footnote 11) = $966,263. $966,263/6 = $161,043.83. $161,043.83 < $165,760.

denies the debtors' request to strip the second lien deed of trust of SunTrust. A separate order will effectuate the findings of this opinion.

_____
Rebecca B. Connelly
U. S. Bankruptcy Judge

13